# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MICHAEL A. DOTSON**
      **Plaintiff,**

    **v.**                                       **Case No. 12-C-0685**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**[1]
        **Defendant.**

---

### DECISION AND ORDER

Pro se plaintiff Michael Dotson seeks judicial review of the denial of his applications for social security disability benefits. Plaintiff claimed that he was unable to work due to ankle, back, and knee problems, but the Social Security Administration ("SSA") denied his applications initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. The SSA's Appeals Council reviewed the ALJ's decision but adopted much of his analysis in also concluding that plaintiff was not disabled. When the Council accepts a case for review and considers the merits, the court reviews its decision as the final decision of the Commissioner of Social Security. See White v. Sullivan, 965 F.2d 133, 136 (7th Cir. 1992).

### I. APPLICABLE LEGAL STANDARDS

#### A.    Disability Determination

Disability is determined under a sequential five-step inquiry, which asks: (1) whether the

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin, who became Acting Commissioner of Social Security on February 14, 2013, is substituted as the defendant in place of Michael J. Astrue.

claimant is currently employed; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if not, whether the claimant can perform his past relevant work; and (5) if not, whether he is capable of performing any work in the national economy. Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011). The claimant bears the burden of proof in each of the first four steps. Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). However, if he reaches step five the burden shifts to the government to present evidence establishing that the claimant possesses the residual functional capacity ("RFC") to perform other work that exists in a significant quantity in the national economy. Weatherbee, 649 F.3d at 569. The agency often relies on two sources of occupational information to determine whether this burden has been met: the Dictionary of Occupational Titles ("DOT") and Vocational Experts ("VEs"). The DOT, published by the Department of Labor, provides standardized occupational information, including the most typical characteristics of jobs as they exist throughout the American economy. Id. Vocational Experts often supplement the information provided in the DOT by providing an assessment of the types of occupations in which claimants can work and the availability of positions in such occupations. Id.

**B.    Judicial Review**

In reviewing the agency's decision, the court does not re-determine disability but rather asks whether the decision denying the claim is supported by "substantial evidence" and based on the proper legal criteria. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence means such relevant evidence as a reasonable person could accept as adequate to support the decision. Kastner, 697 F.3d at 646. Under this deferential standard, the court may

2

not re-weigh the evidence, make independent credibility determinations, or substitute its judgment for the agency's. McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011). The court must nevertheless conduct a critical review of the entire record. Id. While the decision need not address every piece of evidence or testimony presented, it may not ignore entire lines of contrary evidence or selectively consider medical reports, Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009); Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009), and it must contain an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled, Kastner, 697 F.3d at 646. The court confines its review to the reasons set forth in the agency's decision. Shauger v. Astrue, 675 F.3d 690, 695-96 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93-95 (1943)).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Applications and Supporting Materials

On April 24, 2008, plaintiff filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of September 6, 2006. (Tr. at 171, 176, 183, 208.)[2] In disability reports, he indicated that he could not work because of a bullet lodged in his right ankle after a shooting, which caused pain and prevented him from standing for long periods of time. He also complained of back and knee pain. (Tr. at 213, 233, 243-46.)

### B. Medical Evidence

The medical records collected by the agency revealed that in 1989, when he was fifteen years old, plaintiff was shot in the right ankle. Doctors at Children's Hospital did not remove

_____

[2]The record indicates that plaintiff filed several previous applications for social security disability benefits, which were denied. (Tr. at 184.)

3

the bullet, and plaintiff subsequently developed pain and mobility issues (e.g., Tr. at 319, 325), which prompted his applications for disability benefits. However, he received only limited medical treatment prior to 2009.

On June 30, 2004, Dr. David Dewitt conducted a consultative examination in conjunction with one of plaintiff's previous applications. Plaintiff indicated that since the shooting he experienced gradually worsening pain in the right ankle as well as paresthesias in the plantar and dorsal aspects of the right foot, greater on the dorsal aspect. He also complained of pain shooting into the upper lateral calf region and a sense of instability. (Tr. at 260.) He reported a history of factory work, which he was unable to continue due to inability to perform standing duties. On physical exam, Dr. Dewitt noted normal sitting posture, and plaintiff was able to arise from a chair with minimal use of his upper extremity. He did occasionally ambulate with a cane in his left hand, and gait was mildly antalgic favoring the right side. His cervical, thoracic, and lumbar spines revealed full range of motion. Lower extremity exam revealed an approximately one cm scar over the anterior medical aspect of the right ankle, with no joint swelling, joint effusion, or muscular atrophy noted. X-rays of the right ankle showed no encroachment of the joint and no inter-articular fragments, just some metallic dust around the ankle joint. (Tr. at 261.) The films were non-weight-bearing, making it difficult to tell for sure, but Dr. Dewitt indicated that plaintiff may radiographically show evidence of lateral ankle instability; there was no evidence of ankle arthrosis.[3] (Tr. at 261-62.) Dr. Dewitt opined that plaintiff would not benefit from bullet removal, as this was intraosseous and not intra-articular. Indeed, Dr. Dewitt suggested that plaintiff may be made worse by neurovascular injury if the

_____

[3]Presumably Dr. Dewitt here referred to arthrosis as a synonym for osteoarthritis. Stedman's Medical Dictionary 151 (27th ed. 2000).

4

bullet was retrieved. Plaintiff did show some signs of nerve injury, which could possibly be due to the gunshot wound. Dr. Dewitt believed that plaintiff could possibly benefit from a diagnostic injection and possible neuroma[4] excision if neuroma could be diagnosed. For his lateral ankle instability, he could benefit from bracing with an air cast or pseudo brace. He may also benefit from physical therapy for ankle strengthening. An MRI may be helpful to evaluate for neuroma, ligamentous injury, or other etiology for his pain. Dr. Dewitt indicated that these injuries could explain why plaintiff had difficulty maintaining work involving standing for significant periods of time. Dr. Dewitt advised him "to seek more sedentary work and to work with no limitation of his symptoms." (Tr. at 262.)

On September 15, 2006, at about 9:00 a.m., plaintiff was seen in the Bellin Health System Hospital emergency room for injuries suffered in an assault. He indicated that at about 3:00 a.m. that day he was hit while trying to break up a fight outside a bar, fell backward to the concrete, and lost consciousness for about two minutes. He went to sleep and woke up with an occipital abrasion and hematoma, posterior cervical neck pain, and bilateral shoulder pain. He admitted drinking alcohol last night and still smelled of alcohol. On exam, he was alert and oriented, appeared to be in pain, and was somewhat uncooperative and argumentative. His neck showed decreased range of motion and pain on movement. He showed severe vertebral tenderness in the upper, mid, and lower cervical spine. He refused a c-spine collar because he had too much pain. (Tr. at 270.) Head and cervical spine CT scans were normal. (Tr. at 269, 271.) ER personnel assessed a contusion of the head and poster cervical spine, and an abrasion of the occipital scalp, discharging him home in good condition with prescriptions for

---

[4]Neuroma refers to abnormal tissue derived from the cells of the nervous system. Stedman's Medical Dictionary 1210 (27th ed. 2000); see also id. at 1189.

Vicodin and Ibuprofen and instructions to apply ice intermittently.  He was not to work that day and the next.  (Tr. at 271.)

On September 19, 2006, plaintiff was seen at the Bellin Health System Family Medical Center, with continued neck pain and headache following the September 15 assault.  Although this was his first visit to the clinic, he indicated that he would like to apply for disability.  On examination, Dr. Jean Riquelme found that plaintiff appeared to be in moderate distress in the neck, with muscular tenderness.  Dr. Riquelme placed him in a soft collar, and plaintiff stated that his neck pain felt somewhat better.  Plaintiff was "really uncooperative throughout the examination."  (Tr. at 263.)  Dr. Riquelme diagnosed neck strain as a result of an accident, possible chronic pain syndrome, and possible drug abuse.[5]  He was placed in the cervical collar for three to five days, with no driving with the collar in place.  Dr. Riquelme also switched him from Vicodin to Percocet and referred him to a chiropractor.  Dr. Riquelme concluded: "I doubt if I will be able to certify him as totally disabled without further information.  Basically he would have to go through physical therapy and work retrain before I would certify him as disabled." (Tr. at 263.)

On April 8, 2007, plaintiff was seen at the Bellin Health emergency room with a skin rash.  (Tr. at 280-81, 283-86.)  He also complained of minor discomfort in the right upper leg, proximal to the knee, present for some time.  He reported no problems with walking but did complain of chronic intermittent "popping" of the right ankle since the gunshot wound.  He stated that "he is really here just for the rash.  He is not concerned about the RLE pain."  (Tr. at 281.)  Dr. Meredith Tucker's impression was skin rash, cause undetermined, and right leg

---

[5]A screen came back positive for cannabinoids.  (Tr. at 264-68.)

pain, cause unclear.  He was to follow up with his doctor in the coming week.  (Tr. at 282.)

On April 26, 2008, plaintiff was seen in the Bellin Health emergency department complaining of right thigh to ankle pain for one month.  (Tr. at 273, 275, 287.)  On physical assessment, the triage nurse noted the old gunshot wound scar on plaintiff's right ankle, but otherwise no swelling, redness, or evidence of any trauma.  (Tr. at 287.)  Dr. George Gorchynsky noted plaintiff's chief complaint to be the injury to his right ankle from the gunshot wound.  He complained of moderate pain, indicating that he was out of pain medication.  On exam, Dr. Gorchynsky also noted the old gunshot wound scar to the right ankle, but no swelling, redness, or evidence of trauma, and plaintiff displayed a normal gait.  (Tr. at 289.)  He was discharged home in good condition the same day with a prescription for Tramadol/Ultram for pain.  (Tr. at 276, 278, 288-90.)

On June 8, 2008, Dr. Pat Chan completed a physical RFC assessment for the SSA, relative to the instant applications for benefits, finding plaintiff capable of medium work, with only occasional climbing of ramps or stairs.  (Tr. at 292-99.)

On September 18, 2008, plaintiff was seen in the Wheaton Franciscan emergency department for chronic ankle pain, worse the past two weeks.  He also complained of low back pain.  Doctors recommended a cane (Tr. at 361-62), and an unsigned September 19, 2008, "prescription & certificate of medical necessity" form lists a single point cane (Tr. at 302).

On December 23, 2008, plaintiff went to Milwaukee Health Services to establish a primary care physician.  He complained of pain in the back, knees, and ankle.  He reported that subsequent to the gunshot wound in 1989 he experienced pain, for which he received treatment in the ER.  Dr. Christopher Withers ordered an x-ray and provided an orthopedic

7

referral. (Tr. at 319-22.)[6]  On January 13, 2009, plaintiff returned, complaining of difficulty ambulating.  Dr. Withers prescribed Vicodin and noted upcoming x-rays.  (Tr. at 323.)  The following day, plaintiff underwent an x-ray of his right ankle, with the report reading: "The ankle joint appears normal.  There is a bullet lodged within the distal tibia on the medial side.  This does not appear to be interfering with the joint space.  The right ankle is normal." (Tr. at 324.)  The report of his right knee x-ray read: "There is no evidence of fracture or other bony abnormality.  The joint space is normal."  (Tr. at 324.)

     On January 27, 2009, Dr. John C. Neilson conducted a consultative examination for the SSA in conjunction with the instant applications.  (Tr. at 303.) Plaintiff complained of right ankle pain, low back pain, and right knee pain.  He indicated that the right ankle pain had been getting significantly worse of late, indicating that he could not stand in the morning because his ankle was so stiff and painful, and that he could not walk more than a block because of his pain.  He also complained of some numbness to the medial aspect of the ankle near the area of the gunshot wound.  He reported having to use a cane because of his ankle problems.  He also complained of low back pain of insidious onset without injury, increasing over the last year, radiating into the buttocks bilaterally, better when sitting or using a cane and worse with stairs, walking long distances, or lifting, bending, pushing or pulling.  His right knee pain was primarily anterior and throbbing, but minor compared to his other problems.  He had not had any formal treatment for his knee, back, or ankle.  (Tr. at 303.) Medications included some occasional use of Vicodin.  He reported work at American Foods but had to stop because of his ankle pain.  On physical exam, cervical, lumbar, and thoracic spine showed normal curvature.  There was

---

[6]Dr. Withers's treatment notes are handwritten and somewhat difficult to read.

8

paraspinal tenderness but no midline tenderness in the lumbar spine. His cervical range of motion was full. Regarding the lumbar spine, he could forward flex to his distal tibias, extend 10 degrees, and side bend 10 degrees without pain. He had a paresthesia over the saphenous distribution just distal to his gunshot wound. He also had pain with range of motion of his ankle, especially impact loading. His right knee was ligamentously stable, with some mild pain with patellar compression, and full range of motion. Radiographs of the right ankle showed a retained missile in the medial plafond of the ankle, likely impacting on the joint surface of the talus, with minimal degenerative change. (Tr. at 304.) Dr. Neilson concluded:

> Mr. Dotson's right ankle has a missile fragment that is likely now intra-articular if it was not before. It is probably aggravating him significantly. To remove this would be a significant undertaking and until it is removed it is unlikely that he will be able to do any significant amount of walking longer than a block. His right knee also bothers him but I think this is minor compared to his knee [sic]. His low back pain would likely be aggravated by any type of lifting, bending, pushing or pulling, especially lifting 10 pounds from the floor up.

(Tr. at 305.)

On February 16, 2009, Dr. George Walcott completed a physical RFC assessment report for the SSA, finding plaintiff capable of sedentary work with occasional climbing of ladders, ropes, and scaffolds. He also had to avoid concentrated exposure to hazards. (Tr. at 306-13.)

On May 5, 2009, plaintiff returned to Milwaukee Health Services, complaining of ankle pain and seeking a medication refill. Rebekah Klarberg, FNP, provided a referral to orthopedics (an ankle specialist) and indicated that the primary care physician would refill medications. (Tr. at 325.) The following day, Dr. Withers provided Percocet. (Tr. at 326.)

On July 21, 2009, plaintiff returned to Dr. Withers, still complaining of right ankle pain, with no relief from Percocet. He also complained of difficulty ambulating up and down stairs.

9

(Tr. at 327.)

On October 1, 2009, plaintiff saw Dr. Anthony Ferguson, an orthopedist, for evaluation of his right ankle pain. He reported consistent problems since 1989, when he was shot. He had off and on discomfort, but things were "getting a bit worse." (Tr. at 333.) He indicated that he could not work because of his ankle pain. He wondered if the bullet could be removed or if anything else could be done. Left lower extremity examination was normal; on the right, he had a scar where the gunshot wound occurred. The ankle showed that he lacked 5 degrees of dorsiflexion on the right compared to the left. Plantar flexion was limited by about the same amount. He was diffusely tender about the ankle, but with no significant swelling and nothing to suggest infection. Radiographs taken that day revealed a bullet fragment embedded into the anteromedial tibia. It was just barely above the joint line and appeared to be below the superior reflection of the anterior ankle capsule. Given the fact that there was likely synovial contact with the bullet, and he was having persistent problems, Dr. Ferguson recommended surgical removal of the foreign body and at the same time a right ankle arthroscopy. Plaintiff was eager to proceed. (Tr. at 333.)

On October 2, 2009, Dr. Withers prepared a letter indicating that plaintiff:

is under my medical care for the treatment of chronic right ankle pain. The derangement in his ankle occurred secondary to a traumatic injury. He is status post open reduction internal fixation, with remote post operative complications, namely pain. He is limited in his ability to ambulate without assistive devices, prolonged standing (greater than 5-10 minutes) exacerbates the pain, with a heighten[ed] sense of pain, and escalating dose requirement of pain medication. To this day, efforts to have an orthopedic specialist clinically evaluate Mr. Dotson, has proven illusive [sic]. In my medical opinion he is not suited for the work force in any capacity until an orthopedic evaluation is obtained. He should not push, pull, lift, until orthopedic evaluation has occurred.

10

(Tr. at 331.)[7]

On October 19, 2009, plaintiff returned to Dr. Ferguson for follow-up of his right ankle pain. He had an antalgic gait and used a cane. They again discussed the surgical option, with Dr. Ferguson explaining that he would back fill the defect with Prodense bone graft substitute. Plaintiff again elected to proceed, and on November 23, 2009, Dr. Ferguson performed the surgery, a right ankle arthroscopy with extensive debridement, and open right ankle distal tibial exostectomy and foreign body removal from the distal tibia. (Tr. at 334-35.) Plaintiff returned to Dr. Ferguson for post-operative follow-up on December 1, 2009, doing reasonably well. He complained of pain but had been in pain management. On examination, the incisions looked great, motor and neurovascular examinations were benign, and there was only a mild amount of swelling. He did "demonstrate symptom magnification with even light touch to the area." (Tr. at 336.) He was to return in three weeks, then plan on initiating physical therapy. (Tr. at 336.)

On December 21, 2009, plaintiff saw Dr. Nosheen Hasan for pain management, complaining of constant pain in the right ankle.[8] Dr. Hasam prescribed Oxycodone and noted that plaintiff needed to start physical therapy. (Tr, at 341, 344, 405, 407.)

On January 19, 2010, plaintiff returned to Dr. Withers, who assessed chronic pain syndrome, prescribing MS Contin, Flexeril, and Oxycodone. (Tr. at 328, 401.) Plaintiff also saw Dr. Hasan on that date, with Dr. Hasan noting lumbar tenderness and decreased lumbar and lower extremity range of motion. Dr. Hasan prescribed medications including Oxycodone.

---

[7]Dr. Withers was apparently unaware that plaintiff had seen Dr. Ferguson the day before.

[8]Plaintiff previously saw Dr. Hasan for low back and knee pain on November 2, 2009, receiving Oxycodone and Keppra. (Tr. at 345-58, 408-20.) Dr. Hasan's notes are also handwritten and hard to read.

11

(Tr. at 339, 403-04.)

In addition to pain management, plaintiff underwent physical therapy with John Duncombe, PT, on referral from Dr. Ferguson. (Tr. at 386.) According to the February 22, 2010 discharge summary, plaintiff attended nine sessions and missed eight. The therapist noted that plaintiff attended just one session since his last MD note. He called two weeks ago and said he was "too busy to come in today, I will see about next week." He did not show up for further appointments, nor did he return phone calls to reschedule missed appointments. He was discharged from therapy due to lack of attendance. (Tr. at 370.) The therapist nevertheless noted 40-50% improvement between the initial visit of December 29, 2009, and the last visit of February 3, 2010. (Tr. at 370, 373.) Regarding activity tolerance, the discharge note indicated: "Standing (10 mins), walking (25 mins), stairs one at a time, not able to run, jump, or work at this time." (Tr. at 370.)

On February 12, 2010, plaintiff saw Dr. Hasan for back and knee pain. Dr. Hasan prescribed Oxycodone and morphine. (Tr. at 439.)

On May 21, 2010, Dr. Withers completed a lower extremities impairment questionnaire, indicating that he had treated plaintiff since May 6, 2009, seeing him every three to four months. (Tr. at 392, 398.) He diagnosed chronic right ankle pain secondary to traumatic gunshot injury, with a poor prognosis. (Tr. at 392.) He checked clinical findings of limited range of motion, tenderness, muscle spasm, joint deformity and instability, and abnormal gait and posture. (Tr. at 392-93.) He listed a primary symptom of constant pain. Dr. Withers opined that plaintiff had the ability to independently initiate ambulation, but could not sustain ambulation or complete activity; he needed to use a cane, and pain interfered with his ability to ambulate effectively. (Tr. at 394-95.) Dr. Withers further opined that plaintiff could sit zero

12

to one hour(s) in an eight hour day, and stand/walk zero to one hour(s) in an eight hour day. He could not continuously sit and needed to get up and move around every ten minutes. (Tr. at 395.) He could never lift or carry any amount of weight. Regarding treatment, Dr. Withers indicated that he prescribed MS Contin, Oxycodone, and Flexeril; plaintiff did not need his legs to be elevated. (Tr. at 396.) Dr. Withers indicated that plaintiff constantly experienced pain, fatigue, and other symptoms severe enough to interfere with attention and concentration; he was capable of low stress. (Tr. at 397.)

On May 25, 2010, plaintiff saw Dr. Withers, who again assessed chronic right ankle pain, prescribing MS Contin and Oxycodone. (Tr. at 400.) On July 27, plaintiff returned to Dr. Hasan, complaining of back and right ankle pain. Oxycodone was continued. (Tr. at 438.)

On August 2, 2010, plaintiff underwent a lower kinetic chain evaluation at the Kenosha Medical Center/Physical Therapy on referral from Dr. Hasan. (Tr. at 430-31.) He complained of constant sharp pain in the right ankle, aggravated by weight bearing, eased by rest. He reported functional limitations of walking (three to five minute bouts), prolonged standing, stair climbing, and prolonged sitting (twenty to twenty-five minutes). (Tr. at 431.) He subsequently attended physical therapy sessions on August 9 and 16, 2010, indicating on the latter date that he "feels that P.T. is not really changing his symptoms." (Tr. at 432.) He had not attended Aquatics. (Tr. at 432.)

On August 27, 2010, Dr. Hasan completed a lower extremities impairment questionnaire, indicating that he had treated plaintiff since November 2, 2009, seeing him once per month. (Tr. at 422, 429, 437.) He diagnosed degenerative joint disease, myofacial pain, and fibromyalgia. Under the heading of prognosis, he wrote "chronic pain." (Tr. at 422.) As clinical findings, he listed limited range of motion and tenderness of the lower back and right ankle.

13

(Tr. at 422.) He also noted muscle spasm at the lower back and right calf and muscle weakness at the right leg. He further listed joint deformity and instability of the right knee and right ankle, abnormal gait, and abnormal posture. As for laboratory and diagnostic test results, he noted a March 5, 2010 MRI scan showing arthritis at the right ankle. (Tr. at 423.) As primary symptoms, he listed pain at the right ankle. Dr. Hasan indicated that plaintiff could independently initiate and sustain ambulation with a cane (Tr. at 424), although pain interfered with his ability to ambulate effectively (Tr. at 425). Dr. Hasan opined that plaintiff could sit for thirty minutes in an eight hour day and stand/walk thirty minutes in an eight hour day; he could not sit or stand/walk continuously in a work setting. (Tr. at 425.) He could occasionally lift and carry five to ten pounds. His right leg needed to be elevated, for two hours, six times per day. (Tr. at 424.) His pain and other symptoms would periodically interfere with attention and concentration; he was capable of low stress. Asked to provide the basis for his conclusions, Dr. Hasan wrote: "evaluate pt once a month and pt explains his symptoms to provider." (Tr. at 427.) Dr. Hasan indicated that plaintiff needed to take unscheduled breaks six times during a workday, resting fifteen minutes before returning to work. His impairments would likely produce good and bad days, and about two to three absences per month. Dr. Hasan further indicated that plaintiff could not push, pull, kneel, bend, and stoop. (Tr. at 428.)[9]

---

[9]The record also contains a psychological evaluation conducted by Dr. James Hammond at the Kenosha Community Health Center in January 2011, after the ALJ issued his decision. (Tr. at 445-51.) Dr. Hammond noted that plaintiff had been "prescribed for by Dr. Hasan. He was discontinued when they found out that he had Morphine and Oxycontin." (Tr. at 448.) Dr. Hammond diagnosed major depressive disorder, recurrent, severe, and anxiety disorder, NOS, with a GAF ("Global Assessment of Functioning") of 50 (Tr. at 451), a score on the border between moderate and serious impairment in function. See Jelinek v. Astrue, 662 F.3d 805, 807 (7th Cir. 2011). Dr. Hammond's plan was to refer plaintiff to a new pain clinic, consider medications targeting insomnia and depression, and obtain job training. (Tr. at 451.)

14

**C.    Hearing Testimony**

On July 2, 2010, plaintiff appeared before ALJ William Zellman for his hearing.  The ALJ also summoned a VE, Robert Neuman.  (Tr. at 49.)

**1.    Plaintiff**

Plaintiff testified that he had not worked since 2006.  (Tr. at 56.)  He indicated that he was thirty-five years old with a tenth grade education and lived with his girlfriend and her three children, ages seven, nine, and fourteen, in an apartment.  (Tr. at 58, 87, 96.)  He stated that he got up between five and seven a.m., his girlfriend went to work, and he  told the kids to make some cereal and get the house cleaned up.  (Tr. at 61.)  He might do some cleaning up in his bedroom and in the bathroom.  (Tr. at 61-62, 84.)  His girlfriend and her daughter did the laundry.  He watched a lot of TV during the day and sometimes read magazines.  (Tr. at 63.)

Plaintiff testified that he took Oxycodone, Naproxen, and morphine (MS Contin) for pain, as well as a sleep medication.  (Tr. at 64-65.)  He indicated that the Oxycodone helped when he first took it but no longer did.  The morphine helped, but it made him drowsy.  (Tr. at 65.)  Physical therapy also helped, but plaintiff stated that he had not gone since his insurance expired.  (Tr. at 66.)  The ALJ noted that, according to the medical records, plaintiff had missed eight PT appointments.  Plaintiff said:

> A       Because he cancelled me.  I had to drive all the way to Milwaukee to get my prescription to get back in.  He said once you – once you get done taking care of your business –
>
> Q       Missed the last four appointments so they discharged you for not attending.
>
> A       Because I didn't – I was taking care of this paperwork.  I was doing all this by myself.

15

Q       There's – I'm going to be honest with you.  That's – that isn't flying with me as a reasonable excuse.

A       Okay.

Q       The paper work for this case –

A       Um-hmm.

Q       – kept you from going to physical therapy?

A       We only had one transportation, Your Honor.  That – that plays a big part.  Because at 6:00, my girl, she goes to work at 5 and sometimes she don't get off until like –

Q       You were calling them and telling them you couldn't go?

A       No.  I called them and asked them as I'm still – can I come in today?  And he was like, well, I took you off.  And I'm like, why did you take me off?  I'm – I want to come.  And he was like, well, you gotta go back to Milwaukee and get you a prescription paper.

(Tr. at 67.)[10]  The ALJ noted that, despite missing almost half of his appointments, after one month of physical therapy plaintiff was able to stand for ten minutes and walk twenty-five minutes.  Plaintiff stated that the therapy involved exercises for "short stops.  It wasn't like a long period, period of time."  (Tr. at 68.)  The therapist massaged his ankle and put him on a machine.  (Tr. at 68.)  Plaintiff indicated that he got his insurance back the previous day, and that he planned to see his doctor to get a new therapy prescription.  (Tr. at 69.)  Plaintiff admitted that if he had a good ankle he could work.  (Tr. at 71.)[11]

--------------------------------

[10]Plaintiff later indicated that he missed therapy because he had to watch the kids, because he attended a funeral in Chicago, and because he lacked transportation.  He admitted that the therapy was in the town where he lived (Kenosha – Tr. at 58), but he still missed half the time.  He stated that because he missed sessions the therapist terminated him, and he had to go back to Milwaukee to get a new prescription from his doctor.  (Tr. at 69-70.)

[11]He later added that back pain also prevented work but admitted that he could do some jobs absent the ankle problem.  (Tr. at 86.)  The back alone would not prevent him from

16

Plaintiff's representative noted that the physical therapy records indicated that plaintiff took stairs one at a time, and plaintiff testified that climbing up and down stairs caused pain. (Tr. at 71.) He could do it but felt pain after the fourth step. The representative also noted that throughout the hearing plaintiff stood up and sat down; plaintiff testified that he did so because of sharp pains in his back, knees, and ankle. He said that he could sit for about four to five minutes before he needed to change positions. (Tr. at 72.) He also claimed problems standing – pain in his ankle and his back giving out. (Tr. at 73.) He testified that he could stand for about five minutes, and that he needed to elevate his feet after five minutes of standing. He indicated that he used a cane, which was prescribed by his doctor in 2008 to help take the strain off his other leg. (Tr. at 74.) Plaintiff also indicated that he had trouble lifting because of his back. He could lift a gallon of milk but no more. (Tr. at 75-76.)

Plaintiff testified that he had surgery on his ankle because his leg was giving out constantly. (Tr. at 76.) He stated that before the surgery he was in pain, but he could work; after the surgery, he could not lift much and constantly had pain. (Tr. at 77, 92.) In order to relieve the pain, he would "go sideways" or "try to dangle my leg on something like a cool, cold pillow, or I try to lift it up in the air." (Tr. at 78.) He indicated that he propped his leg up when he sat down, eight or nine times per day. (Tr. at 78-79.) He indicated that after he took his medication he usually fell asleep for about an hour. (Tr. at 79.) He took his medications three times per day. (Tr. at 82.)

Plaintiff testified that he could not do a sit down job because he had to move around due to pain. The pain got worse after his surgery. (Tr. at 87.) He indicated that there were days

working; the ankle was his number one problem. (Tr. at 89.)

17

– about six per month – when he could not leave the house because his leg gave out. He indicated that he fell about four times per month. (Tr. at 88.)

    **2.**    **VE**

The VE first identified plaintiff's past jobs: auto detailer, car washer, horse stable attendant, factory cleaner, kitchen worker, short order cook, hand packer, machine operator, fast food worker, hotel worker, industrial sweeper, and trimmer in a meat processing plant. (Tr. at 94-96.) All of these jobs were unskilled save the short order cook, which provided no transferrable job skills. (Tr. at 96.) Further, all of these jobs were done at the light exertional level or higher; a sedentary RFC would eliminate all past work. (Tr. at 96.)

The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, restricted to unskilled sedentary work, with no standing or walking greater than five minutes, no lifting from floor level, and no carrying more than five pounds, with the ability to use a cane when walking. The VE testified that such a person could work as a surveillance monitor, hand packer, or production inspector. (Tr. at 97.) If the person could not continuously sit more than thirty minutes, at which time he would need to change positions for one to two minutes before resuming sitting, the person could still work as a surveillance monitor; as long as productivity was not affected, he could also work as a hand packer and production inspector. (Tr. at 97-98.) If the person needed to be able to change positions from sitting to standing at will, the surveillance monitor job could still be done; depending on the work setting, this could affect the hand packer and production inspector jobs. A person limited to a maximum of one hour of sitting, one hour of standing, and one hour of walking per eight hours, as indicated in Dr. Withers's report, would not be able to work. (Tr. at 98.)

Case 2:12-cv-00685-LA   Filed 03/04/13   Page 18 of 25   Document 15

Plaintiff's representative framed a hypothetical around plaintiff's testimony. A person who expected to fall four times within a month; would be absent in excess of six times per month; needed a one hour nap in the morning and in the afternoon; and needed to elevate his leg to greater than waist height eight to nine times per day, would not be able to secure or maintain employment. (Tr. at 99-100.)

**D.    ALJ's Decision**

On October 8, 2010, the ALJ issued an unfavorable decision. The ALJ determined that plaintiff had not worked since September 6, 2006, the alleged disability onset date, and that he suffered from the severe impairment of right ankle dysfunction. Based on the absence of any objective medical support, the ALJ found plaintiff's back and knee problems non-severe. (Tr. at 24.) At step three, the ALJ considered Listings 1.02 and 1.03, finding neither met because plaintiff remained able to ambulate effectively as defined in Listing 1.00. (Tr. at 25.)

The ALJ then determined that plaintiff retained the RFC for unskilled, sedentary work that allowed for use of a cane with ambulation and did not require continuous walking or standing in excess of five minutes, lifting from floor level, or carrying more than five pounds. (Tr. at 25.) The ALJ considered plaintiff's testimony in making this determination, but gave it "only limited weight." (Tr. at 29.) The ALJ noted that at the hearing plaintiff used a cane and alternated between sitting and standing, but he did not appear to be in pain and only exhibited a mild limp upon leaving the hearing room – observations inconsistent with plaintiff's testimony and the post-operative opinion of Dr. Withers. The ALJ also noted plaintiff's testimony that he underwent surgery in 2009 because his leg was giving out, which was inconsistent with Dr. Withers's pre-surgery reports and plaintiff's allegations to his medical providers that he was in constant pain. Additionally, plaintiff suggested at the hearing that he missed physical therapy

19

appointments because he needed to prepare for his disability hearing, an explanation the ALJ found not credible. The ALJ noted that plaintiff's failure to attend treatment did not comport with 20 C.F.R. §§ 404.1530(a) & 416.930(a), which require a social security claimant to follow treatment prescribed by his physician that could restore ability to work. Finally, the ALJ found plaintiff's testimony inconsistent with his symptoms and allegations listed in the medical record. He repeatedly stated to doctors and other specialists that he could not work; however, at he hearing, he testified that he had pain but could work prior to his most recent surgery. (Tr. at 29.)

The ALJ also considered Dr. Withers's treating source statement, concluding that it was not entitled to controlling weight. The ALJ found that the report overstated plaintiff's limitations and was not supported by the overwhelming objective medical evidence. The ALJ noted that, prior to the surgery, Dr. Withers indicated that plaintiff's ankle was fine and observed nothing to be wrong with plaintiff's leg in general. (Tr. at 28.) Additionally, Dr. Withers's current opinion did not take into account the progress plaintiff made during physical therapy when he actually appeared. (Tr. at 28-29.) The ALJ also noted that the evidence provided by physical therapist Dumcombe showed that, with consistent treatment, plaintiff could make improvements in strength, range of motion, and mobility, inconsistent with Dr. Withers's opinion of complete disability following plaintiff's recent operation. In light of the objective medical evidence, the ALJ concluded that Dr. Withers's report could not be given significant weight. (Tr. at 29.)

The ALJ instead gave significant weight to the reviews of Drs. Dewitt and Riquelme regarding plaintiff's pre-surgery allegations. Upon physical examination and record review, both opined that, without more evidence, plaintiff would still be able to continue in the sedentary work environment, which comported with the pre-surgery statement of Dr. Withers that there

20

was not any joint interference with plaintiff's right ankle and that it appeared normal.  (Tr. at 29.)

The ALJ also gave significant weight to the RFC assessment conducted by Dr. Walcott in

February 2009.  With the benefit of plaintiff's entire medical record to that point, Dr. Walcott

opined that plaintiff's allegations and objective findings were consistent and fully credible, but

still found that plaintiff had full strength in his upper and lower extremities and could handle

sedentary work even with chronic pain taken into account.  (Tr. at 29.)

Given this RFC, the ALJ found plaintiff unable to perform any past relevant work.  (Tr.

at 30.)  However, the ALJ denied the claim at step five, accepting the VE's testimony that a

person like plaintiff could work as a surveillance monitor, hand packer, or production inspector,

all unskilled, light [sic] jobs.  (Tr. at 31.)  The ALJ therefore found plaintiff not disabled.  (Tr. at

31-32.)

**E.     Appeal's Council Decision**

The Appeals Council granted plaintiff's request to review the ALJ's decision (Tr. at 11,

17-18), but modified the basis for – rather than reversing – the denial.  The Council adopted

the ALJ's statement of evidentiary facts and findings at steps one through four of the sequential

evaluation process.  The Council also agreed with the ALJ's ultimate conclusion at step five

that plaintiff was capable of performing jobs that exist in significant numbers in the national

economy.  However, the Council disagreed that plaintiff was capable of performing all of the

jobs cited by the VE because all but one was inconsistent with the assessed RFC.  Specifically,

the Council noted that the VE cited light exertion jobs, while plaintiff was limited to sedentary

work.  Nevertheless, the Council noted that the DOT listed the job of surveillance monitor as

a sedentary position, consistent with plaintiff's RFC, and accepted the VE's testimony that a

significant number of such jobs were available in Wisconsin.  (Tr. at 4-7, 12-13.)

### III. DISCUSSION

In this court, plaintiff argues that (1) the position of surveillance system monitor no longer exists in significant numbers; (2) the ALJ failed to adequately support his credibility determination; and (3) the ALJ ignored Dr. Hasan's report.[12]  I address argument each in turn.

**A.    Surveillance System Monitor**

As indicated, the Appeals Council modified the ALJ's step five determination, finding that plaintiff could perform (only) the position of surveillance monitor, a sedentary job according to the DOT.  The agency may rely on the DOT and/or a VE at step five of the sequential process. See Weatherbee, 649 F.3d at 569.

Citing an entry from Wikipedia, plaintiff argues that the occupation of surveillance system monitor (DOT # 379.367-010) no longer exists in significant numbers:

> The Dictionary of Occupational Titles was last updated in 1986.  After September 11, 2001, these jobs were put under the Transportation Security Administration. These jobs require skilled and trained workers.  Very few, if any, employers ask employees to simply sit and watch a bank of monitors.   Employers ask surveillance system monitors to do a wider variety of security-related tasks throughout the work day, thus rendering the exertional level required to [do] the occupation greater than sedentary.

(Pl.'s Br. at 2, citing http://en.wikipedia.org/wiki/Surveillance_system_monitor.)

Plaintiff did not present this evidence (or otherwise contest the DOT description of this job) at the administrative level, and the correctness of the agency's decision depends on the evidence that was before it.  See Eads v. Sec'y of Dept. of Health and Human Services, 983

---

[12]I review the Council's decision as the final decision of the Commissioner.  However, because the Council adopted the ALJ's analysis of the medical evidence and testimony, any error made by the ALJ may fairly be attributed to the Council.  The Commissioner does not argue otherwise but rather defends the ALJ's decision on these issues.

F.2d 815, 817 (7th Cir. 1993).[13]  Further, the DOT has been acknowledged as the best source for how a job is generally performed.  Carmickle v. Comm'r, SSA, 533 F.3d 1155, 1166 (9th Cir. 2008); see also Weatherbee, 649 F.3d at 569.  Wikipedia, which is written collaboratively by largely anonymous internet volunteers, United States v. Lawson, 677 F.3d 629, 650-51 (4th Cir.), cert. denied, 133 S. Ct. 393 (2012), has no similar claim to reliability as a source of occupational information, Alsyouf v. Astrue, No. EDCV 11-1867, 2013 WL 327794, at *18 (C.D. Cal. Jan. 29, 2013).  Therefore, plaintiff's first argument fails.

## B.   Credibility

Under social security regulations, the ALJ must provide "specific reasons" for his assessment of the claimant's credibility, supported by the evidence and articulated in the decision.  SSR 96-7p; see also 20 C.F.R. § 404.1529.  The reviewing court will afford the ALJ's credibility determination special deference, reversing only if it is patently wrong.  Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012).

Plaintiff argues that the ALJ erred by not providing specific reasons for his credibility finding in this case.  However, plaintiff overlooks the numerous reasons the ALJ gave for affording plaintiff's testimony only limited weight, including his demeanor at the hearing, the inconsistency between his allegations and Dr. Withers's pre-surgery reports, his failure to attend physical therapy without good excuse, and the inconsistency between his testimony and the symptoms listed in the medical record.  Plaintiff does not challenge any of these findings

---

[13]Plaintiff makes no argument for a sentence six remand based on this evidence.  See Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003) ("To merit a remand pursuant to the sixth sentence of 42 U.S.C. § 405(g), a claimant must show that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding.") (internal quote marks omitted).

23

or otherwise develop an argument that the ALJ's determination was patently wrong. See Anderson v. Hardman, 241 F.3d 544, 545 (7th Cir. 2001) (holding that a generalized assertion of error is not sufficient to challenge an adverse ruling, and that undeveloped or unsupported contentions are waived).

## C.    Dr. Hasan's Report

Opinions from a social security claimant's treating physician are entitled to "special significance."  SSR 96-8p.  Such an opinion must be given "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.  20 C.F.R. § 404.1527(c)(2).  A report that does not meet the test for controlling weight is still entitled to deference and must be weighed under the checklist of factors set forth in 20 C.F.R. 404.1527.  SSR 96-2p; see also Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011).  The ALJ must always offer "good reasons" for discounting a treating physician's opinion, Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010); such opinions may not be ignored, see, e.g., Myles, 582 F.3d at 678; Henderson v. Barnhart, 257 F. Supp. 2d 1163, 1168 (E.D. Wis. 2002).

In this case, the ALJ rejected the opinions from plaintiff's primary care physician, Dr. Withers.  However, as plaintiff notes, the ALJ made no mention of the report from Dr. Hasan, plaintiff's treating pain management specialist.

The Commissioner responds that the ALJ provided sound reasons for rejecting Dr. Withers's similar report (which would, presumably, also apply to Dr. Hasan's).  The Commissioner also contends that the record fails to make clear the treatment relationship plaintiff had with Dr. Hasan; Dr. Hasan seemed unaware that Dr. Ferguson performed surgery; and Dr. Hasan made no statements about the physical therapy ordered for plaintiff.  The

24

Commissioner concludes that there is thus no reason to accord any weight to the forms filled out by Dr. Withers or Dr. Hasan.[14] However, "the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." Kastner, 697 F.3d at 648; see also Roddy v. Astrue, No. 12-1682, 2013 WL 197924, at *6 (7th Cir. Jan. 18, 2013); Hughes v. Astrue, No. 12-1873, 2013 WL 163477, at *3 (7th Cir. Jan. 16, 2013); Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010). Perhaps on remand the ALJ will evaluate Dr. Hasan's report as the Commissioner does in his brief, but the Chenery doctrine precludes me from affirming based on such arguments. The matter must be remanded for consideration of Dr. Hasan's report.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the agency's decision is **REVERSED**, and the matter is **REMANDED** for further proceedings consistent with this decision.[15] The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 4th day of March, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[14]Plaintiff does not specifically contest the ALJ's rejection of the Withers report.

[15]In his statement of relief, plaintiff asks that the ALJ's decision be reversed and he be found disabled. However, a judicial finding of disability "is appropriate only if all factual issues have been resolved and the record supports a finding of disability." Briscoe, 425 F.3d at 356. In this case, the ALJ must on remand determine the weight to be accorded Dr. Hasan's report.